**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| LEMKO CORPORATION, an Illinois Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>MICROSOFT CORPORATION, a Washington Corporation,<br><br>Defendant. | ) | Civil Action No. 3:26-cv-01876<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT FOR WILLFUL PATENT INFRINGEMENT

1. Plaintiff Lemko Corporation ("Lemko") files this Complaint for Patent Infringement and Demand for Jury Trial against Microsoft Corporation ("Defendant") and alleges as follows:

2. Lemko developed and patented novel technology for innovative network technologies for multi-access edge computing. The United States Patent and Trademark Office ("USPTO") awarded Lemko U.S. Patent Nos. 7,653,414, 8,688,111, 9,191,980, and 9,332,478. Exhibits 1-4 (the "Asserted Patents"). Microsoft has known of Lemko's Asserted Patents for years. Microsoft chose to willfully infringe Lemko's patents rather than take a license. Lemko filed this suit to protect its valuable intellectual property from Microsoft's ongoing willful infringement.

## THE PARTIES

3. Lemko is an Illinois corporation, with its principal place of business at 846 East Algonquin Road, Suite #101, Schaumburg, IL 60173.

4. Founded in 2004, Lemko provides a leading, fully edge-capable mobile network platform and resilient 4G/5G wireless networks for use in Industrial Internet of Things ("IoT")

applications, private 4G/5G networks, wireless rural broadband systems, and military and public safety deployments.

5. Microsoft Corporation ("Microsoft") is a Washington corporation. Microsoft may be served through its agent for service of process, CSC Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, TX 78701-3218.

6. Microsoft developed and sells the Accused Products (defined below).

## JURISDICTION AND VENUE

7. This action for patent infringement arises under the patent laws of the United States, 35 U.S.C. § 101 *et seq.* This Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §§ 1331 and 1338.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1400(b).

9. The Court has personal jurisdiction over Microsoft because Microsoft has continuous and systematic contacts with this District. Microsoft Corporation maintains an office in this District at 7000 and 7100 State Highway 161, Building LC1 & LC2, Irving, Texas 75039. On information and belief, this office is a regular and established place of business.

10. Additionally, the Court has personal jurisdiction over Microsoft in this action because Microsoft has committed acts of direct and indirect infringement in this District, including through selling and offering for sale infringing products and services in this District, because Lemko's claims arise out of and relate to Microsoft's acts of infringement in this District, and because the exercise of jurisdiction by the Court over Microsoft in this action would be reasonable and would not offend traditional notions of fair play and substantial justice given Microsoft's persistent presence and contacts with this District.

11. Microsoft did not and does not challenge personal jurisdiction or venue in *Lemko Corp. v. Microsoft Corp.*, No. 3:22-cv-00363-K ("*Microsoft I*"), currently pending in this District before Judge Kinkeade. Both Lemko and Microsoft are parties to *Microsoft I*, in which Lemko asserts the same Asserted Patents at issue in this case against different Microsoft products.

## LEMKO'S INNOVATIONS AND ASSERTED PATENTS

12. Based in Schaumburg, Illinois, Lemko has developed commercial networks using 2G/CDMA/GSM, 3G, 4G, and 5G technologies.

13. In 2004, Lemko began offering innovative network products and services that provided multi-access edge computing ("MEC") products and services. MEC refers to the computing or processing of network traffic and services closer to the customer (the "edge" of a network) as opposed to having that processing functionality provided by remote servers (the "cloud") located further away from the customer.

14. Lemko's products were based on decentralized and virtualized network computing offerings that were very different from then-conventional hardware-based, circuit-switched network technology offerings. Lemko's MEC products and services allow mobile devices to communicate through a nearby edge server without having to connect through a far-away regional call center relying on older, circuit-switched technology, thereby improving data speeds and network efficiencies and significantly reducing costs.

15. Conventional cellular networks were based on circuit-switched, circuit transmission networks with a centralized, hierarchical architecture. All calls were carried from cell towers to regional call centers over expensive backhaul connections. The regional call centers relied on stacks of custom hardware to manage and route calls for an entire region. The cell towers had no functionality for managing and routing calls, since that capacity was located

in the regional call centers. This approach had many disadvantages, including the need for expensive backhaul to and from regional call centers, even when the two parties to a phone call were in the same area, because the cell towers could not manage or connect calls without the regional call centers.

16. Conventional networks depended on specialized and dedicated hardware to control routing. The mobile switching centers ("MSCs") were housed at large Digital Signal Processor ("DSP") equipment server centers, where the MSCs relied on stacks of DSP equipment servers and provided the call processing functionality for the networks, including switching functions, call set-up, call termination, and routing.

17. Lemko's products and services use a novel, distributed mobile architecture ("DMA") structure. Lemko's decentralized DMA architecture offered significant benefits over then-conventional cellular networks. In contrast to the centralized conventional networks, Lemko's DMA networks are based on software-based DMA servers, which connect to form peer-to-peer DMA networks. Each DMA server has local cellular network management functionality that allows for calls to be connected without the centralized servers of a regional call center.

18. Lemko's decentralized networks allowed for network function virtualization ("NFV") for MEC, which refers to processing of network traffic and services by locating the processing centers closer to the customer (the "edge" of a network) as opposed to locating that computing functionality in centralized server farms.

19. Lemko's networks are also virtualized, which refers to using software-based network resources that can operate on general purpose servers instead of dedicated hardware devices. For example, Lemko's DMA products implement network functionalities, such as

Mobile Switching Center ("MSC"), Base Station Controller ("BSC"), community location register ("CLR"), and home location register ("HLR") functionality on software running on a standard server.

20. Lemko's innovative approach allowed the link between cellular radio (Base Transceiver Station ("BTS") in 2G, NodeB in 3G, E-UTRAN Node B ("eNodeB") in 4G and Next Generation Node B ("gNB") in 5G) and MEC server (DMA server) to be changed from conventional circuit-based transmission to full IP-based transmission.

21. In addition, Lemko's technology enables connecting multiple cellular nodes via IP connections, thereby reducing or eliminating backhaul via T1/E1 circuit-based communication lines and eliminating or reducing the need for a centralized center or hub.

22. Lemko developed multiple product lines based on its breakthrough network functionalities. Lemko's MEC products and services allow local mobile devices to communicate through an edge server without connecting through a regional call center. This ensures faster data processing with lower latencies, reduced network congestion, and improved network efficiencies while delivering these innovative performance improvements at reduced costs.

23. The United States Patent and Trademark Office ("USPTO") awarded to Lemko a series of patents covering solutions for providing MEC networks and other improvements in communications technology and the underlying infrastructure.

24. On January 26, 2010, the USPTO issued U.S. Patent No. 7,653,414 (the "'414 Patent"), entitled "System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture." The '414 Patent identifies Dr. Pan as its inventor and states

that it was assigned to Lemko. Attached hereto as Exhibit 1 is a true and correct copy of the ’414 Patent.

25. On April 1, 2014, the USPTO issued U.S. Patent No. 8,688,111 (the “’111 Patent”), entitled “System, Method, and Device for Providing Communications Using a Distributed Mobile Architecture.” The ’111 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 2 is a true and correct copy of the ’111 Patent.

26. On November 17, 2015, the USPTO issued U.S. Patent No. 9,191,980 (the “’980 Patent”), entitled “System and Method to Control Wireless Communications.” The ’980 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 3 is a true and correct copy of the ’980 Patent.

27. On May 3, 2016, the USPTO issued U.S. Patent No. 9,332,478 (the “’478 Patent”), entitled “System, Method, and Device for Routing Calls Using a Distributed Mobile Architecture.” The ’478 Patent identifies Dr. Pan as its inventor and states that it was assigned to Lemko. Attached hereto as Exhibit 4 is a true and correct copy of the ’478 Patent.

28. The ’414, ’111, ’980, and ’478 Patents are collectively referred to herein as the “Asserted Patents.”

29. The Asserted Patents are not abstract and specifically claim inventive concepts that represent significant improvements over then-conventional networking technology. Specifically, each of the Asserted Patents describes various hardware architectures with a variety of connection techniques that can be used with mobile device technology, particularly in edge-networks.

30. The Asserted Patents disclose a distributed mobile architecture ("DMA") in which network management and call-routing functionality is distributed among decentralized DMA servers connected via peer-to-peer Internet Protocol ("IP") connections, rather than concentrated in a centralized mobile switching center ("MSC"). The DMA servers can implement MSC and base-station controller ("BSC") functionality in software running on inexpensive, commercially available hardware, enabling calls to be routed locally between DMA servers without traversing costly backhaul connections to a centralized hub.

31. This distributed architecture provides concrete and specific technological improvements over conventional networks, including: (a) dramatically reduced deployment costs, enabling extension of cellular coverage to rural and remote communities that could not economically support conventional infrastructure; (b) self-healing and redundant network coverage, such that if one DMA server fails, telephony traffic is automatically rerouted to remaining operable DMA servers; (c) decentralized call routing that eliminates the single points of failure inherent in centralized MSC-based architectures; and (d) scalable network expansion through the simple addition of new DMA servers without requiring connection to a centralized hub.

32. The Asserted Patents further solve problems relating to different aspects of a DMA system. Some of the claims of the Asserted Patents use a DMA gateway ("DMAG") to connect one DMA network to other DMA networks or non-DMA networks. Various of the claims of the Asserted Patents cover systems that can determine whether a mobile device should be connected to a different DMAG and describe DMAG-DMAG communications (such as over peer-to-peer connections), local call switching, and distributed routing of network traffic to reduce latencies and costs while improving network traffic efficiencies. The Asserted

Patents further extend to fault tolerance, network management, and scalability, allowing DMAGs to dynamically handle handoffs, reroute network traffic to destination devices, and maintain service continuity, by detecting and responding to network failure conditions.

33. The Asserted Patents further claim specific components to implement DMA networks including community location registers ("CLRs"), destination preference registers ("DPRs"), and distributed authentication, authorization, and accounting ("AAA") modules and call routing components. These components work together in a specific and unconventional manner to enable distributed call routing, seamless handoff between DMA servers, and interoperability with legacy communications networks.

34. The technology disclosed in the Asserted Patents was not available in the art at the time of Lemko's breakthrough network functionality developments because conventional networking systems did not provide such functionality, and did not provide the specific solutions using the specific components set forth in the claims of the Asserted Patents. To the contrary, then-conventional technology was based on a different paradigm where much of the network resources and processing was centrally located in large, air-conditioned server farms, and controlled with large racks of hardware relying on DSP and custom hardware cards, rather than with smaller, distributed network elements running on commercially-available off-the-shelf (COTS) server hardware that work together at the "edge" of the network.

35. The networks of the Asserted Patents are not a combination of generic components to perform conventional activities. The Asserted Patents improve networking systems, especially for use in edge networks, and solve specific problems with edge networks variously using new components in an unconventional manner. For example, the claims of the

Asserted Patents variously recite DMA servers, DMA gateways, CLRs, DPRs, and networking flows that were not conventional at the time of Lemko's patented inventions.

36. In addition, the claims of the Asserted Patents are rooted in computer technology as they are directed to specific hardware architectures with different applications that improve the communications of and between mobile devices and the infrastructure supporting such devices. The Asserted Patents solve technological problems that arose from the centralized, rigid, and hardware-based conventional networks, as discussed above. Thus, the claims of the Asserted Patents recite specific steps and components to accomplish the desired results and go beyond simply claiming results. Accordingly, Lemko's breakthrough network functionalities described in the Asserted Patents allow for a new kind of infrastructure and communications network that was not previously possible.

## LEMKO MARKS ITS PATENT-PRACTICING PRODUCTS

37. At all times, Lemko has complied with 35 U.S.C. § 287(a) by marking its patent-practicing products with stickers identifying the applicable Asserted Patents covering those products and further identifying in writing the applicable Asserted Patents in the documentation for its software products. Lemko has not made, offered for sale, or sold any unmarked patent-practicing products.

38. The following is a representative example of Lemko's patent marking labelling that identifies the Asserted '414, '111, '980, and '478 Patents (in addition to other Lemko patents).




Detail of patent marking label listing the ’414, ’111, ’980, and ’478 Patents.



Full view of Lemko’s Node1 product with patent marking label.

**MICROSOFT’S PRE-SUIT KNOWLEDGE AND WILLFUL INFRINGEMENT**

39. Microsoft has had pre-suit knowledge of Lemko’s patent portfolio through its extensive course of dealing with Lemko, including at least four years of prior litigation between the parties involving all four of the Asserted Patents, which placed Microsoft on

notice of Lemko's patent rights and enforcement positions, at least as of the February 14, 2022 date of filing of the *Microsoft I* complaint. Exhibit 5.

40. During the course of the *Microsoft I* case, Lemko has provided detailed infringement contentions and other disclosures relating to the Asserted Patents which further place Microsoft on notice of the Asserted Patents and that the Accused Products infringe.

41. On information and belief, Microsoft is also aware of the Asserted Patents through Martin Taylor, who was in Microsoft's Office of the CTO, Azure for Operator, and in Microsoft's Program Management, Azure for Operator until November 2022. In the 2010 to 2012 timeframe, under the NDA protection signed between Metaswitch and Lemko, Mr. Taylor was the CTO of Metaswitch Networks. During that time, Mr. Taylor and others at Metaswitch discussed a potential partnership with Lemko, evaluated Lemko's technology, and participated in meetings with Lemko. Lemko informed Metaswitch that Lemko had obtained patents and was pursuing additional patents covering its inventions. Mr. Taylor remained with Metaswitch Networks until Microsoft acquired it in July 2020. On information and belief, Mr. Taylor was directly involved in the Accused Products discussed below and, therefore, knew that the Accused Products infringe Lemko's Asserted Patents.

42. Further, on information and belief, Microsoft is also aware of the Asserted Patents through Rick Lievano, who is in Microsoft's Office of the CTO, WW Telecommunications, and in the Office of Worldwide Director of Industry Technology Strategy until 2021. In the 2017 timeframe, Mr. Lievano was the Director, Industry Technology Strategy, EPG Communications & Media Sector at Microsoft. During that time, Mr. Lievano and others at Microsoft discussed a potential partnership with Lemko, executed a non-disclosure agreement, evaluated Lemko's technology, and participated in meetings with

Lemko. Lemko informed Mr. Lievano and others at Microsoft that Lemko had obtained patents and was pursuing additional patents covering its inventions, including the technology that Lemko demonstrated to Microsoft.

43. On information and belief, Mr. Lievano was directly involved in the Accused Products discussed below and, therefore, knew that the Accused Products infringe Lemko's Asserted Patents.

44. Further, on information and belief, Microsoft knew of the Asserted Patents and that Microsoft's Accused Products (defined below) infringed the Asserted Patents from its awareness of Lemko's patent-marked products described above, which compete with the Accused Products.

45. Lemko sent a notice letter to Microsoft on April 22, 2026, prior to filing this action. A copy of the letter is attached hereto as Exhibit 6 ("Notice Letter"). In the Notice Letter, Lemko specifically identified Microsoft's Azure for Operator Nexus, Azure Network Functions, and Azure Operator Edge products as infringing various patents in Lemko's portfolio and referenced the *Microsoft I* case in which Lemko is asserting the Asserted Patents against Microsoft. *Id.* Lemko further informed Microsoft "of its ongoing use of Lemko's patented technology and infringement." *Id.* The Notice Letter also pointed out that the USPTO awarded Lemko patents for its innovative network products providing decentralized and virtualized multi-access edge computing. *Id.*

46. Despite Microsoft's knowledge of the Asserted Patents, Microsoft continues to infringe Lemko's Asserted Patents through its ongoing sales of the Accused Products. And, even after receiving Lemko's Notice Letter, on information and belief, Microsoft has not taken any steps to remedy this violation.

47. Microsoft's conduct demonstrates a deliberate and conscious disregard for Lemko's intellectual property rights. Given the totality of the pre-suit circumstances described above and Microsoft's ongoing infringement since the filing of this action, Microsoft's infringement of the Asserted Patents has been and continues to be willful, deliberate, and in egregious disregard of Lemko's patent rights, entitling Lemko to enhanced damages pursuant to 35 U.S.C. § 284 and an award of attorneys' fees pursuant to 35 U.S.C. § 285.

**MICROSOFT'S INFRINGING PRODUCTS**

48. Microsoft makes, uses, sells, offers for sale, and imports into the United States and this District products and services that infringe the Asserted Patents (the "Accused Products").

49. The Accused Products are used to provide mobile network control and management functions, including on decentralized and virtualized networks, and are used to operate MEC or private telecommunications networks for data transmission and voice calls that can interoperate with outside networks, such as the Internet and common-carrier cellular networks.

50. As discussed in more detail below, the Accused Products include network functionality, servers, and add-on services. Network control software manages the connections between users and the network and provides network access. Servers are used to store and operate the software that provides the mobile network management functionality. Add-on services include a variety of additional functionalities for managing, monitoring, and controlling the networks.

51. Microsoft sells the Accused Products to customers as software to operate on the customers' own servers, sells combinations of software and servers to run the software, and sells the Accused Products as a "service" where Microsoft configures and operates the Accused

Products for its customers. *See, e.g.*, https://www.youtube.com/watch?v=eC1hVJK4Un4 at 7:02 (AT&T, Verizon, Singtel, T-Mobile).

52. The Accused Products include at least the following products and services:

- Azure Operator Nexus;
- Azure Operator Edge;
- Azure MEC; and
- Azure Programmable Connectivity (APC).

53. **Azure Operator Nexus**: As part of the Azure for Operators Portfolio, Azure Operator Nexus is a carrier-grade product that supports customers' distributed facilities and allows telecom operators to run network functions on-premises. Exhibit 7 at 1-2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393) ("Azure Operator Nexus is a purpose-built service for hosting carrier-grade network functions."). Azure Operator Nexus infringes the Asserted Patents.




Exhibit 8 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/) at 1

(showing that Azure Operator Nexus is a Microsoft-offered product that is part of the Azure for Operators portfolio) (highlight added).

54. Microsoft touts Azure Operator Nexus as "purpose-built for operators' network-intensive workloads and mission-critical applications." Exhibit 9 at 1 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview).




Exhibit 7 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393) at 1-2 (showing that Azure Operator Nexus is a carrier-grade infrastructure deployed at the network edge for hosting operators' 5G network functions).




Exhibit 9 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview) at 1-2 (showing the Azure Operator Nexus operating system (OS) deployed on-premises as the infrastructure software layer below the operator's tenant layer which includes network functions).

55. Azure Operator Nexus offers the ability to future-proof the network to support mission-critical workloads, and power new revenue-generating services and applications. It is "[p]urpose-built for and validated by tier one operators to run mission-critical workloads," enabling operators to run workloads on-premises or on Azure, where they can seamlessly deploy, manage, secure, and monitor everything—from the bare metal to the tenant. Exhibit

10 at 2 (https://blogs.microsoft.com/blog/2024/02/25/accelerating-telco-transformation-in-the-era-of-ai/).

56. Azure Operator Nexus uses commercially available off-the shelf (COTS) servers and additional hardware infrastructure for providing and hosting telco-grade network functions virtualization infrastructure (NFVI). Exhibit 11 at 1-2 (https://learn.microsoft.com/en-us/azure/operator-service-manager/how-to-create-site).

57. For example, Microsoft provides operators with "a curated and certified hardware bill of materials (BOM) . . . consist[ing] of… COTS… servers, network switches, and storage arrays." Exhibit 9 at 2 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview). The NVFI provided by Azure Operator Nexus hosts virtualized network components "in an operator's on-premises datacenter" or on Azure servers and supports the deployment of both virtualized network functions (VNFs) and containerized network functions (CNFs). *Id.*; *see also* Exhibit 11 at 1-2 (https://learn.microsoft.com/en-us/azure/operator-service-manager/how-to-create-site). For example, Azure Operator Nexus "delivers operator mobile core and vRAN network functions securely . . . on-premises (far-edge, near-edge, core datacenters)." Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).




Exhibit 7 at 3-4 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393) (showing deployment of the telco-grade network functions and services in distributed and centralized data centers, on and off operator premises, using Azure Operator Nexus).

58. Using companion programs and software, "Azure Operator Nexus delivers a comprehensive ecosystem of certified network functions through the Azure Operator Nexus Ready program. The program employs Azure Operator Service Manager, a companion service that gives consistent and scalable NF deployment experience for CNFs and VNFs from multiple network-function vendors." Exhibit 7 at 5.




*See* https://www.youtube.com/watch?v=LRs5ioOn4TM (showing that through the Azure Operator Nexus Ready program, Microsoft provides validated network functions including AMF, UPF, NEF, and SMF, to telecom operators).

59. Specifically, Azure Operator Nexus supports end-to-end deployment of container network functions. Network functions can be deployed directly from Azure Operator Service Manager onto the operator's network. The network management plane is located in Azure and the control plane and user plane functionality is deployed in an operator's on-premises datacenters. Exhibit 12 (https://azure.microsoft.com/en-us/products/operator-nexus/?msockid=29fa54790f4a64330ed2433a0ee06506).

60. In the Microsoft Operator Nexus testimonial, Jason Zander (EVP), Yousef Khalidi (CVP), and Igal Elbaz (CTO AT&T) explain that Operator Nexus is core to Azure, and deeply integrated into the hyperscale public Cloud platform, deployed across six continents in over 60 regions with millions of servers, network devices, and massive amounts of globally distributed storage capacity. *See* Video (Total length: 6:20): Azure Operator Nexus, available

at https://azure.microsoft.com/en-us/products/operator-nexus (Transcript of Video, Exhibit 30); *see also* https://www.youtube.com/watch?v=s7zNnXfptsI.; Exhibit 15 (https://azure.microsoft.com/en-us/blog/microsofts-virtual-datacenter-tour-opens-a-door-to-the-cloud/).



*See* https://www.youtube.com/watch?v=lHJ7Odlsi3M (showing deployment of an SMF network function on Operator Nexus using Azure Operator Service Manager).

61. Microsoft touts that Azure Operator Nexus "delivers a rich Azure experience, including visibility into logging, monitoring, and alerting for infrastructure components and workloads." Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393). Microsoft explains that one of the key benefits of Azure Operator Nexus is that it has the ability "to provide harmonized observability for both infrastructure and applications." *Id*. According to Microsoft, "[t]his means one can easily monitor and troubleshoot any issues that may arise, ensuring systems are running smoothly and efficiently." *Id.*

62. According to Microsoft, Azure Operator Nexus also "collects logs, metrics, and traces from network function virtualization infrastructure (NFVI) and network functions (NFs) . . . [and] offers a rich analytical, AI/ML-based toolset to develop descriptive and prescriptive analytics." Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).

63. **Azure Operator Edge**: According to Microsoft, Azure Operator Edge brings Azure services and carrier-grade capabilities to the edge for ultra-low latency scenarios. Azure Operator Edge enables monetization of Microsoft's Azure for Operators Portfolio of products via customer-focused edge services and customer experience initiatives such as Azure Multi-Access Edge Compute (MEC) in private and public networks. Exhibit 8 at 1 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/).

64. **Azure MEC**: Azure MEC enables operators and systems integrators to deliver public or private cellular, enterprise workloads, and edge compute services with ease, offering

a robust partner network while combining computing, networking, and services on hardware located at the edge. Public MEC emphasizes scalability and shared infrastructure, while private MEC focuses on control, security, and compliance. Exhibit 13 at 2 (https://learn.microsoft.com/en-us/previous-versions/azure/public-multi-access-edge-compute-mec/overview), Exhibit 14 at 1-2 (https://acom-sandbox.azure.net/en-us/solutions/private-multi-access-edge-compute-mec/#overview).

65. **Azure Private MEC**: Azure Private MEC combines network functions—including 4G and 5G—applications, and edge-optimized Azure services to deliver high performance, ultra-low-latency solutions that address the modern business needs of enterprise customers. The Azure global cloud platform, connectivity, and ecosystem of partners and application developers allow operators and systems integrators to offer innovative enterprise solutions as fully managed services across a broad range of industries. Exhibit 14 at 1 (https://acom-sandbox.azure.net/en-us/solutions/private-multi-access-edge-compute-mec/#overview).




*Id.* (showing Azure Private MEC as an Azure cloud-managed edge compute service).

66. Azure private MEC simplifies the delivery of ultra-low-latency 4G and 5G connectivity at operator's customer sites and bundles edge applications to create innovative new solutions and revenue streams for operators. It deploys packet core and radio access network functions from the Azure Marketplace to provide private 4G and 5G connectivity that enables the enterprise to reliably and securely run low-latency applications. Azure private MEC expands connectivity options to include SD-WAN, security firewalls, and VPN gateways on a single-edge platform.

67. Azure private MEC enables easy deployment across a range of hardware platforms using Azure Arc and Azure Network Function Manager. Operators can select from a portfolio of Microsoft platform options or use their existing hardware to host solutions that are all managed and monitored in Azure. By integrating compute, connectivity, Azure services,

and applications into a single platform, Azure Operator Nexus allows operators to spend less time growing their equipment footprint and more time growing their business.

68. Azure private MEC enables operators to build solutions with Azure services and validated applications from a rich ecosystem of ISV partners that are developing market-specific IoT applications across the Microsoft global customer base. It can leverage edge-optimized services such as Azure AI Services, Azure Machine Learning, Azure Stream Analytics, and Azure IoT Edge to create intelligent solutions that drive the digital transformation of enterprise networks, processes, and business models across a broad range of industry verticals.

69. **Azure Programmable Connectivity (APC)**: APC provides a unified, standard interface across operators' networks. APC provides seamless access to Open Gateway for developers to create cloud and edge-native applications that interact with the intelligence of the network. According to Microsoft, APC also empowers operators to commercialize their network APIs, provides developers with seamless access to create applications that leverage network intelligence, and is available in the Azure Marketplace. Exhibit 10 at 2 (https://blogs.microsoft.com/blog/2024/02/25/accelerating-telco-transformation-in-the-era-of-ai/).




*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 at 7:02 (showing network capabilities across multiple different operators for connected apps including video streaming apps).




*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 (showing the features provided by APC such as credential management, resource monitoring, billing, etc.).







*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 (showing APC supporting coordinated video-streaming applications across different cities).

70. The Accused Products are supported by network APIs to provide a robust suite of private and public 5G network deployments with ultra-low latencies and high data bandwidths based on dynamically adjusted cloud usage.




*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 (showing how the Accused Products' key capabilities are supported by network APIs deployable through APC).

**COUNT I**
**(Direct Infringement of the '414 Patent)**

71. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

72. Microsoft has infringed and continues to infringe the '414 Patent, including at least Claim 11, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States at least the Accused Products without the permission, consent, authorization, or license of Lemko.

73. Microsoft's infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

74. To the extent any components of the claimed systems are provided by Microsoft's customers, Microsoft directly infringes by acting as the final assembler of the infringing system. Microsoft acts as the final assembler by configuring the final infringing system at the direction of its customers. Microsoft dictates the precise hardware that its customers must procure to utilize Azure Operator Nexus, which "uses a curated and certified hardware bill of materials (BOM) . . . consist[ing] of commercially available off-the-shelf (COTS) servers, network switches, and storage arrays . . . deployed in an operator's on-premises datacenter." Exhibit 9 at 2 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview). Microsoft also deploys Azure Operator Nexus on top of this hardware as Azure Operator Nexus is "an end-to-end platform from the infrastructure to the tenant for applications" and fully manages and controls the infringing system because "[t]he service that manages the Azure Operator Nexus infrastructure is hosted in Azure." *Id.*

75. Microsoft further directly infringes by directing and controlling the infringing systems, and obtains benefits from its control of the systems as a whole, for example, when Microsoft configures and maintains the infringing systems as a paid service for its customers.

76. Microsoft's customers directly infringe by using and making (to the extent Microsoft is the final assembler of the infringing system) the Accused Products as an operating network. As set forth with respect to Count II, Microsoft induces and contributes to its customers' direct infringement.

77. By way of example of Microsoft's infringement of the '414 Patent, Microsoft Azure Operator Nexus meets all of the limitations of Claim 11 of the '414 Patent. Claim 11, for example, recites the following limitations:

Claim 11. A distributed mobile architecture (DMA) system, comprising:

a housing;

a base transceiver station coupled to the housing, the base transceiver station operable to receive a call from a mobile subscriber;

a computer readable storage medium within the housing, the computer readable storage medium comprising:

an authentication, authorization, and accounting (AAA) module embedded within the computer readable storage medium, the AAA module comprising:

a home location register (HLR) that stores information associated with one or more mobile subscriber devices that are registered with the DMA system;

a visitor location register (VLR) that stores information associated with one or more roaming mobile subscriber devices that are temporarily registered with the DMA system;

a community location register (CLR) that stores information associated with a second HLR of a second DMA system, wherein the second HLR stores information associated with one or more mobile subscriber devices that are registered with the second DMA system; and

a destination preference register (DPR) that stores one or more preferred call paths for calls to be routed outside of a DMA network that is accessible to the DMA system, wherein the DMA network includes at least the first DMA system and the second DMA system,

a call routing component embedded within the computer readable storage medium, the call routing component comprising processor executable instructions to route the call via a particular preferred call path of the one or more preferred call paths stored at the DPR when the AAA module determines that the call is directed to a destination device that is outside of the DMA network.

78. Microsoft's Azure Operator Nexus provides both the software and hardware infrastructure for hosting and deploying various telecom grade network functions in at least one DMA system. Exhibit 12 (https://azure.microsoft.com/en-us/products/operator-nexus).

79. Azure Operator Nexus supports a single rack BOM, meaning all of the network functions can be co-located within one housing coupled to the gNB or vRAN at the edge. Exhibit 16 at 2-3 (https://techcommunity.microsoft.com/blog/telecommunications-industry-

blog/azure-operator-nexus-%E2%80%93-the-ultimate-cloud-native-solution-for-mobile-workloads/4066207).

80. The DMA system provides a plurality of network functions including a User-Plane Function (UPF), a Session Management Function (SMF), an Access and Mobility Management Function (AMF), a network exposure function (NEF), a network repository function (NRF), a network slice selection function (NSSF), and AAA functionality based on a policy control function (PCF), a unified data register (UDR) module, an Authentication Server Function (AUSF), and a Unified Data Management (UDM) module. Exhibit 17 (3GPP TS 23.501) at 147-154 (listing and defining the 5G Core Network Functions including AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.). These components are software on the computer readable storage medium.

81. One or more interconnected DMA systems of Azure Operator Nexus further include CU/DU/RAN transceiver equipment providing the functionality of a base transceiver station. Exhibit 18 at 1 (https://marketplace.microsoft.com/en-us/product/inventeccorp1645697962291.5g_e2e?tab=overview). The CU/DU/RAN transceiver equipment is coupled to the housing of the DMA system and operable to receive a call from a mobile subscriber. *Id.*; *see also* Exhibit 19 (https://www.nokia.com/newsroom/nokia-and-stc-use-microsoft-azure-operator-nexus-to-successfully-perform-o-ran-based-5g-private-wireless-network-trial/).

82. In addition to Azure Operator Nexus, Azure Operator Edge also brings Azure services and carrier-grade capabilities to the edge for ultra-low latency scenarios via interconnected DMA systems. Exhibit 8 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/). For example, Azure Operator Edge supports Azure Multi-

Access Edge Compute (MEC) in private and public networks and includes subscriber database, policy control, control plane, and user plane network functions. Exhibit 20 at 1-2 (https://www.cloudthat.com/resources/blog/deploy-a-private-mobile-network-using-azure-private-5g-core). Azure Operator Edge includes CU/DU/RAN equipment providing the functionality of a base transceiver station operable to receive a call from a mobile subscriber. Exhibit 18 at 1 (https://marketplace.microsoft.com/en-us/product/inventeccorp1645697962291.5g_e2e?tab=overview). Azure Operator Edge includes AAA functionalities as described above with respect to Azure Operator Nexus. Because Azure Operator Edge deployments are physically located near the cellular towers and host CU/DU/RAN modules, Azure Operator Edge necessarily interfaces with wireless RF transceivers.

83. The DMA system described above can determine whether the mobile device that is to receive the call is within its service area or the service area of another DMA system. To do this, the DMA system uses UDR, PCF, UDM, and AUSF, in conjunction with the AMF, SMF, and UPF, to provide authentication, authorization, and accounting (AAA) functionality. Regarding charging, the user plane function (UPF), together with the session management function (SMF), performs accounting functions and collects charging data based on a particular user's usage that results in a call detail record. Exhibit 17 (3GPP TS 23.501) at 46, 97, 106; Exhibit 21 (3GPP TS 23.503) at 9-10. Regarding subscription management, the access and mobility function (AMF), authentication server function (AUSF), and unified data management (UDM) collectively serve as an attachment point for subscribers and perform subscriber management and authentication, authorization, and accounting (AAA) functions. Exhibit 17 (3GPP TS 23.501) at 97, 106; Exhibit 21 (3GPP TS 23.503) at 9-10.

84. The UDM is responsible for serving network function registration management, which means it determines whether a mobile subscriber is registered with the first or second UPF/SMF/AMF 5G Core instance (the first or second DMA system) based on subscription information stored in the UDR. Exhibit 17 (3GPP TS 23.501) at 152.

85. The PCF accesses subscription information relevant for policy decisions in the UDR, supports unified policy framework to govern network behavior, and provides policy rules to control plane functions such as the SMF and AMF to enforce them. Exhibit 17 (3GPP TS 23.501) at 150.

86. In the context of the network functions deployed on Azure Operator Nexus or Azure Operator Edge, the roles traditionally served by the home location register (HLR) in 2G/3G networks are handled by the unified data management (UDM) network function, which manages user data, and the unified data repository (UDR) network function, which serves as the centralized database for this information holding the subscription data and data defining network and user policies. Exhibit 17 (3GPP TS 23.501) at 152-153. The UDM and UDR provides visitor location register (VLR) functionality as well. Additionally, the packet detection rules (PDRs) in the UPF include registration information configured by SMF using the packet detection information (PDIs), forward action rules (FAR), QoS enforcement rules, and usage reporting rules (URR).

87. As the home location register (HLR), composed of the UDR and UDM, is common between instantiations of the 5G Core running on Azure Operator Nexus on different servers, the HLR functions as a community location register (CLR). Additionally, the UPF routing table within each DMA system operates as a CLR, because it stores IP addresses associated with mobile devices being serviced by other DMA systems, enabling routing of call

traffic to the appropriate destination. Therefore, each instance of the 5G Core deployed on Azure Operator Nexus (the first and second DMA system) has an HLR, VLR and CLR storing information about mobile subscriber devices in the network.

88. If the mobile device is determined to be outside of the coverage areas of any of the DMA systems in the DMA network, the UPF routes the data to a data network outside of the DMA network. The SMF configures the UPF to route the call to the mobile device's preferred data network. The SMF stores this PDU network-choice configuration in its local data store (Destination Preference Register ("DPR")). The SMF configures the PDU session by designating a UPF as the PDU session anchor, thereby establishing a DPR to determine the preferred call path for routing the call outside the DMA network. Additionally, IP routing functionality (which may be integrated in the UPF or a separate component) stores the address of the preferred next-hop IP router which functions as a DPR.




Lemko-produced demonstrative showing the first and second DMA system, the DMA network, and routing the call via a call path outside of a DMA network to "IP network."

89. The UPF designated as the PDU Session Anchor by the SMF (call routing component) contains the routing instructions from the SMF to route the call to the network outside of the DMA network shown above (processor executable instructions). Specifically, the instructions stored in the UPF include registration information configured by SMF using the packet detection information (PDIs), forward action rules (FAR), QoS enforcement rules, and usage reporting rules (URR). This designation of the UPF as the PDU Session Anchor by the SMF occurs when the AAA module determines that the call is directed to a destination

device outside of the DMA network based on the location information stored at the AAA module described above. Based on this information, a routing path is established and the UPF routes the call to the destination device located in the "IP Network" shown in the above demonstrative.

90. Microsoft's integrated carrier-edge ecosystem that includes Azure Operator Edge, alone or in combination with Azure Stack Edge, provides call routing functionality via the Azure Programmable Connectivity (APC) module, the Azure MEC, and associated telecom-grade network functions. APC operates within this carrier-edge environment and provides a unified, standard interface across operators' networks for telecom operators and developers to programmatically access network capabilities. It provides APIs for connectivity, quality of service, and network-aware application development. APC provides for the abstraction of call signaling or session routing via developer APIs to influence connectivity and optimize application performance. According to Microsoft, APC provides programmable interfaces for network-aware applications, enabling scenarios like QoS control, edge resource selection, and integration with operator capabilities. Exhibit 22 (https://thewindowsupdate.com/2023/02/26/azure-programmable-connectivity-powers-network-aware-applications/).

91. For example, when a call is received, APC receives signaling and session information associated with the communication and determines how the communication should be routed through the telecommunications network for a call that is outside of the DMA network. APC then directs the routing of the communication through the appropriate edge-network resources deployed on the Operator Edge infrastructure.

92. Microsoft's direct infringement of the '414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

93. Microsoft has had knowledge of Lemko's patents, including the '414 Patent, since at least as early as 2017, if not earlier. Microsoft further learned of its infringement of the '414 Patent from Lemko's filing of the *Microsoft I* complaint, service of '414 Patent infringement contentions for other Microsoft products in *Microsoft I*, and service of the Notice Letter. Microsoft's ongoing infringement in view of this knowledge and notice is willful, blatant, and in egregious disregard for Lemko's patent rights. Microsoft, thus, acted recklessly, willfully, wantonly, and deliberately engaged in acts of infringement of the '414 Patent, justifying an award to Lemko of increased damages.

94. Microsoft's infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

95. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT II**
**(Indirect Infringement of the '414 Patent)**

96. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

97. As set forth above, Microsoft has had knowledge of Lemko's patents, including the '414 Patent, since at least as early as 2017, if not earlier.

98. As set forth with respect to Count I, Microsoft's customers directly infringe the '414 Patent when they use or assemble the Accused Products as an operating network. In addition to directly infringing the '414 Patent, as discussed above, Microsoft has induced and

contributed to its customers' direct infringement of the '414 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Azure Operator Nexus as a system infringing at least Claim 11.

99. Microsoft instructs and encourages its customers on how to use the core features of Azure Operator Nexus, including deployment of 5G Core Network Functions, through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, all of which are intended to enable and encourage the infringing use and installation of Azure Operator Nexus to infringe the '414 Patent.

100. As noted above, for Microsoft Azure Operator Nexus, Microsoft directs its customers to buy a specific BOM (bill of materials) including servers, network switches, dedicated storage arrays, and terminal servers. Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).

101. Microsoft's websites promote Azure Operator Nexus and describe the benefits of Azure Operator Nexus.

102. For example, Microsoft operates a comprehensive online site called Microsoft Learn, with pages including "How-To Guides" and "Quickstarts" covering the configuration, deployment, and use of Azure for Operator Nexus in an infringing manner (as described above). Exhibit 23 (https://learn.microsoft.com/en-us/azure/operator-nexus/). Microsoft Learn covers in-depth installing and configuring of Azure for Operator Nexus, and includes tutorials, articles, and other information regarding Azure for Operator Nexus' mobile edge computing and services features. It also describes the system prerequisites required to run Azure Operator

Nexus. Exhibit 24 (https://learn.microsoft.com/en-us/azure/operator-nexus/howto-azure-operator-nexus-prerequisites).

103. Microsoft is liable for contributory infringement of the ’414 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that it is contributing to infringement of at least Claim 11 by offering to sell and selling in the United States Azure Operator Nexus. The Azure Operator Nexus software is not a staple article or commodity of commerce suitable for substantial non-infringing use. This is because, as discussed above, when used to operate a system in a mobile network, the software infringes the ’414 Patent. It has no function other than to provide these core infringing functionalities. Thus, there is no substantial non-infringing use for Azure Operator Nexus.

104. Microsoft’s indirect infringement of the ’414 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

105. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

**COUNT III**
**(Direct Infringement of the ’111 Patent)**

106. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

107. Microsoft has infringed and continues to infringe the ’111 Patent, including at least Claim 15, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States at least the Accused Products without the permission, consent, authorization, or license of Lemko.

108. Microsoft's infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

109. To the extent any components of the claimed systems are provided by Microsoft's customers, Microsoft directly infringes by acting as the final assembler of the infringing system. Microsoft acts as the final assembler by configuring the final infringing system at the direction of its customers. Microsoft dictates the precise hardware that its customers must procure to utilize Azure Operator Nexus, which "uses a curated and certified hardware bill of materials (BOM) . . . consist[ing] of commercially available off-the-shelf (COTS) servers, network switches, and storage arrays . . . deployed in an operator's on-premises datacenter." Exhibit 9 at 2 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview). Microsoft also deploys Azure Operator Nexus on top of this hardware as Azure Operator Nexus is "an end-to-end platform from the infrastructure to the tenant for applications" and fully manages and controls the infringing system because "[t]he service that manages the Azure Operator Nexus infrastructure is hosted in Azure." *Id.*

110. Microsoft further directly infringes by directing and controlling the infringing systems, and obtains benefits from its control of the systems as a whole, for example, when Microsoft configures and maintains the infringing systems as a paid service for its customers.

111. Microsoft's customers directly infringe by using and making (to the extent Microsoft is the final assembler of the infringing system) the Accused Products as an operating network. As set forth with respect to Count IV, Microsoft induces and contributes to its customers' direct infringement.

112. By way of example of Microsoft's infringement of the '111 Patent, Microsoft Azure Operator Nexus meets all of the limitations of Claim 15 of the '111 Patent. Claim 15 recites the following limitations:

> Claim 15. A method comprising:
>
> receiving at a first distributed mobile architecture (DMA) system, a call from a first mobile subscriber to a second mobile subscriber;
>
> determining whether the second mobile subscriber is registered with one of the first DMA system and a second DMA system based on information stored at an authentication, authorization, and accounting (AAA) module, wherein the information stored at the AAA module includes:
>
>> a first home location register (HLR) that stores information associated with one or more mobile subscribers that are registered with the first DMA system; and
>>
>> a first community location register (CLR) storing information associated with a second HLR of the second DMA system, wherein the second HLR stores information associated with one or more mobile subscribers that are registered with the second DMA system, and wherein the second DMA system includes a second CLR; and
>
> initiating connection of the call from the first mobile subscriber to the second mobile subscriber via the first DMA system and the second DMA system when the second mobile subscriber is registered with the second DMA system.

113. Microsoft's Azure Operator Nexus, using interconnected DMA systems, provides both the software- and hardware-based infrastructure for hosting and deploying various telecom grade network functions. *See* Exhibit 12 (https://azure.microsoft.com/en-us/products/operator-nexus). Each DMA system provides a plurality of network functions including a User-Plane Function (UPF), a Session Management Function (SMF), an Access and Mobility Management Function (AMF), a network exposure function (NEF), a network repository function (NRF), a network slice selection function (NSSF), and AAA functionality based on a policy control function (PCF), a unified data register (UDR) module, an Authentication Server Function (AUSF), and a Unified Data Management (UDM) module.

Exhibit 17 (3GPP TS 23.501) at 147-154 (listing and defining the 5G Core Network Functions including AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.). The LMF supports location determination for a mobile device by obtaining downlink location measurements or a location estimate from the mobile device, uplink location measurements from the next-generation radio access network (NG-RAN), and obtains non-mobile device associated assistance data from the NG RAN. The UDR, UDM, and other network functions of the interconnected DMA systems further include functionality associated with at least one subscriber database such as a home location register (HLR), a visitor location register (VLR), or a community location register (CLR).

114. In addition to Azure Operator Nexus, Azure Operator Edge also brings Azure services and carrier-grade capabilities to the edge for ultra-low latency scenarios via interconnected DMA systems. Exhibit 8 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/). For example, Azure Operator Edge provides Multi-Access Edge Compute (MEC) in private and public networks via a plurality of DMA systems, and includes subscriber database, policy control, control plane, and user plane network functions. Exhibit 20 at 1-2 (https://www.cloudthat.com/resources/blog/deploy-a-private-mobile-network-using-azure-private-5g-core). Azure Operator Edge enables monetization of Microsoft's Azure for Operators Portfolio of products via customer-focused services and customer experience initiatives that include AAA functionalities as described above with respect to Azure Operator Nexus.

115. As explained below, the DMA systems include functionality to receive, at a first DMA system, a call from a first mobile subscriber to a second mobile subscriber. For example, the first DMA system has AMF and SMF modules that are fundamental control-plane

components in a 5G core network. The AMF receives all connection and session-related information from the User Equipment (UE) (N1/N2) and is responsible for handling connection and mobility management tasks. *See* Exhibit 25 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/what-is-the-5g-access-and-mobility-management-function-amf/3707685). The messages related to session management are forwarded over the N11 reference interface to the SMF. *Id.* As a mobile network comprises many AMF instances, a Globally Unique AMF Identifier (GUAMI) is employed. The mobile device specifies this in the first Non-Access Stratum (NAS) message it sends, which is routed to the required AMF by the RAN. Applicable to both 3GPP access and non-3GPP access, the GUAMI also ensures that messages from a UE, registered through both access networks, get forwarded to the same AMF. The Non-3GPP Interworking Function (N3IWF) is responsible for routing messages outside the 5G RAN. *Id.* The UPF performs "packet routing & forwarding" and supports "Uplink classifier to route traffic flows to an instance of a data network." Exhibit 17 (3GPP TS 23.501) at 149.

116. The DMA systems have the functionality for determining whether the second mobile subscriber is registered with the first or second DMA system based on information stored within the AAA modules which include the PCF, UDR, UDM, AUSF, SMF, HLR, and CLR. For example, the DMA systems determine whether the second mobile subscriber is registered with the first or second DMA system based on AAA functionality through modules such as the AMF, PCF, UDR, AuSF, UDM, which collectively provide subscriber data management, authorization, policy enforcement, secure access control, and network function authentication capabilities.

117. The DMA systems also provide functionality to initiate connection of the call from the first mobile subscriber to the second mobile subscriber via the first DMA system and the second DMA system when the second mobile subscriber is registered with the second DMA system, for example, when the first subscriber is located at a first location associated with the first DMA system and the second subscriber is located at a second location associated with the coverage area of the second DMA system.




Exhibit 7 at 1, 3-4 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393) (showing deployment of validated network functions, such as UPF, AMF, SMF, UDR, etc., and other services "such as . . . subscriber data management, and billing policy," on and off operator premises using Azure Operator Nexus).

118. A first DMA system (AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.) receives a Voice over New Radio (VoNR) call from a first

mobile device (the first mobile subscriber) in the wireless coverage area of the first DMA system. The call is directed to a target mobile device (a second mobile subscriber) in the wireless coverage area of a second server cluster running 5G Core Network Functions on Azure Operator Nexus NVFI with a second DMA system (AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.). The first mobile device transmits the VoNR call data (user plane traffic) to the base station (gNB) and then to the UPF in the first DMA system via the N3 interface. The UPF of the first DMA system can also receive this telephony traffic from other UPFs in the network. The mobile device transmits control plane data to the gNB and then to the AMF in the first DMA system via the N1 interface.

119. The DMA system includes AAA functionalities and modules described above such as the AMF, UDR, PCF, UDM, SMF, and AUSF. Exhibit 17 (3GPP TS 23.501) at 147-154 (listing and defining the 5G Core Network Functions including AMF, UDR, PCF, UDM, SMF, and AUSF).

120. The DMA system can determine whether the mobile device that is to receive the call is within its service area or the service area of another DMA system. To do this, the DMA system uses UDR, UDM, PCF, and AUSF, in conjunction with the AMF, SMF, and UPF, to provide authentication, authorization, and accounting (AAA) functionality. Regarding charging, the UPF, together with the SMF, performs accounting functions and collects charging data based on a particular user's usage that results in a call detail record. Exhibit 17 (3GPP TS 23.501) at 46, 97, 106; Exhibit 21 (3GPP TS 23.503) at 9-10. Regarding subscription management, the UDR, AUSF, and UDM collectively serve as an attachment point for subscribers and perform subscriber management and authentication, authorization, and accounting (AAA) functions. Exhibit 17 (3GPP TS 23.501) at 97, 106; Exhibit 21 (3GPP

TS 23.503) at 9-10. The AMF using the UDM is responsible for user identification handling, access authorization based on subscription data stored in the UDR, network function registration management for a mobile device, subscription management, and lawful intercept functionality, which means it determines whether a mobile subscriber is registered with the first or second UPF/SMF respectively associated with the first or second DMA system. Exhibit 17 (3GPP TS 23.501) at 152. The AUSF supports authentication server network function. *Id.*

121. In the context of the telecom-grade network functions deployed on the NFVI of Azure Operator Nexus, the roles traditionally served by the home location register (HLR) in 2G/3G networks is handled by the UDM network function, which manages user data, and the UDR network function, which serves as the centralized database for this information holding the subscription data and data defining network and user policies. Exhibit 17 (3GPP TS 23.501) at 152-153. Additionally, the packet detection rules (PDRs) in the UPF include registration information configured by SMF using the packet detection information (PDIs), forward action rules (FAR), QoS enforcement rules, and usage reporting rules (URR).

122. As the home location register (HLR), composed of the UDR and UDM, is common between instantiations of the 5G Core network running on Azure Operator Nexus on different servers, the HLR functions as a community location register (CLR). Additionally, the UPF routing table within each DMA system operates as a CLR, because it stores IP addresses associated with mobile devices being serviced by other DMA systems, enabling routing of call traffic to the appropriate destination. Therefore, each instance of the 5G Core network functions deployed on Azure Operator Nexus (the first and second DMA system) has an HLR and CLR storing information about mobile subscribers.

123. Microsoft's Azure Operator Nexus providing NFVI using interconnected DMA systems for hosting and deploying various telecom grade network functions initiates the connection of a VoNR call between the first and second mobile subscribers at the first and second 5G Core instances (first and second DMA systems). The call data packets transmitted by the first mobile subscriber pass through the UPF of the first DMA system which routes the packets to the destination system (second DMA system) based on subscription information stored in the UDR. The UDM utilizes the data stored in the UDR to determine if the second mobile subscriber is registered with the first or second system. Upon reception of the call data packet at the UPF of the second DMA system, the packet is routed to the target mobile device through the user plane of the second DMA system (the UPF to the gNB to the user).



The above diagram was created by Lemko as a demonstrative to illustrate how the 5G Core on Azure Operator Nexus connects a call between a first mobile subscriber and a second mobile subscriber via the first DMA system and the second DMA system when the second mobile subscriber is registered with the second DMA system.

124. Once the destination of the call is determined to be a mobile subscriber registered with the second system, the SMF in each system configures the UPFs to establish a user-plane path between the systems, such as via inter-UPF communication shown above, allowing traffic to be forwarded between the respective UPFs. Thus, the call is connected from the first mobile subscriber through the first DMA system to the second mobile subscriber through the second DMA system.

125. Microsoft's integrated carrier-edge ecosystem that includes Azure Operator Edge initiates connection of the call from the first mobile subscriber to the second mobile subscriber via the first DMA system and the second DMA system when the second mobile subscriber is registered with the second DMA system via the call routing functionality provided by the Azure Programmable Connectivity (APC) module, the Azure MEC, and associated telecom-grade network functions.

126. Microsoft's direct infringement of the '111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

127. Microsoft has had knowledge of Lemko's patents, including the '111 Patent, since at least as early as 2017, if not earlier. Microsoft further learned of its infringement of the '111 Patent from Lemko's filing of the *Microsoft I* complaint, service of '111 Patent infringement contentions for other Microsoft products in *Microsoft I*, and service of the Notice Letter. Microsoft's ongoing infringement in view of this knowledge and notice is willful,

blatant, and in egregious disregard for Lemko's patent rights. Microsoft, thus, acted recklessly, willfully, wantonly, and deliberately engaged in acts of infringement of the '111 Patent, justifying an award to Lemko of increased damages.

128. Microsoft's infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

129. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT IV**
**(Indirect Infringement of the '111 Patent)**

130. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

131. As set forth above, Microsoft has had knowledge of Lemko's patents, including the '111 Patent, since at least as early as 2017, if not earlier.

132. As set forth with respect to Count III, Microsoft's customers directly infringe the '111 Patent when they use or assemble the Accused Products as an operating network. In addition to directly infringing the '111 Patent, as discussed above, Microsoft has induced and contributed to its customers' direct infringement of the '111 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Azure Operator Nexus as a system infringing at least Claim 15.

133. Microsoft instructs and encourages its customers on how to use the core features of Azure Operator Nexus, including deployment of 5G Core Network Functions, through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, all

of which are intended to enable and encourage the infringing use and installation of Azure Operator Nexus to infringe the ’111 Patent.

134. As noted above, for Microsoft Azure Operator Nexus, Microsoft directs its customers to buy a specific BOM (bill of materials) including servers, network switches, dedicated storage arrays, and terminal servers. Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).

135. Microsoft’s websites promote Azure Operator Nexus and describe the benefits of Azure Operator Nexus.

136. For example, Microsoft operates a comprehensive online site called Microsoft Learn, with pages including “How-To Guides” and “Quickstarts” covering the configuration, deployment, and use of Azure for Operator Nexus in an infringing manner (as described above). Exhibit 23 (https://learn.microsoft.com/en-us/azure/operator-nexus/). Microsoft Learn covers in-depth installing and configuring of Azure for Operator Nexus, and includes tutorials, articles, and other information regarding Azure for Operator Nexus’ mobile edge computing and services features. It also describes the system prerequisites required to run Azure Operator Nexus. Exhibit 24 (https://learn.microsoft.com/en-us/azure/operator-nexus/howto-azure-operator-nexus-prerequisites).

137. Microsoft is liable for contributory infringement of the ’111 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that it is contributing to infringement of at least Claim 15 by offering to sell and selling in the United States Azure Operator Nexus. The Azure Operator Nexus software is not a staple article or commodity of commerce suitable for substantial non-infringing use. This is because, as discussed above,

when used to operate a system in a mobile network, the software infringes the ’111 Patent. It has no function other than to provide these core infringing functionalities. Thus, there is no substantial non-infringing use for Azure Operator Nexus.

138. Microsoft’s indirect infringement of the ’111 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

139. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

**COUNT V**
**(Direct Infringement of the ’980 Patent)**

140. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

141. Microsoft has infringed and continues to infringe the ’980 Patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States at least the Accused Products without the permission, consent, authorization, or license of Lemko.

142. Microsoft’s infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

143. To the extent any components of the claimed systems are provided by Microsoft’s customers, Microsoft directly infringes by acting as the final assembler of the infringing system. Microsoft acts as the final assembler by configuring the final infringing system at the direction of its customers. Microsoft dictates the precise hardware that its customers must procure to utilize Azure Operator Nexus, which “uses a curated and certified

hardware bill of materials (BOM) . . . consist[ing] of commercially available off-the-shelf (COTS) servers, network switches, and storage arrays . . . deployed in an operator's on-premises datacenter." Exhibit 9 at 2 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview). Microsoft also deploys Azure Operator Nexus on top of this hardware as Azure Operator Nexus is "an end-to-end platform from the infrastructure to the tenant for applications" and fully manages and controls the infringing system because "[t]he service that manages the Azure Operator Nexus infrastructure is hosted in Azure." *Id.*

144. Microsoft further directly infringes by directing and controlling the infringing systems, and obtains benefits from its control of the systems as a whole, for example, when Microsoft configures and maintains the infringing systems as a paid service for its customers.

145. Microsoft's customers directly infringe by using and making (to the extent Microsoft is the final assembler of the infringing system) the Accused Products as an operating network. As set forth with respect to Count VI, Microsoft induces and contributes to its customers' direct infringement.

146. By way of example of Microsoft's infringement of the '980 Patent, Microsoft Azure Operator Nexus meets all of the limitations of Claim 1 of the '980 Patent. Claim 1, for example, recites the following limitations:

> Claim 1. A method comprising:
>
> receiving a first call from a first mobile device at a first base transceiver station (BTS) interface of a first distributed mobile architecture (DMA) server, wherein the first call is associated with a destination device;
>
> determining that a first distributed mobile architecture gateway (DMAG) supports communication with the destination device based on registration data stored at the first DMA server, wherein the registration data indicates that the destination device is not within a wireless coverage area associated with the first DMA server, and wherein the first DMAG is communicatively coupled to a plurality of DMA servers including the first DMA server;

converting first voice information associated with the first call to first packet data; and routing the first packet data to the destination device via the first DMAG.




Lemko-produced demonstrative showing a first DMA server and first DMAG.

147. Microsoft's Azure Operator Nexus provides both the software- and hardware-based infrastructure for hosting and deploying various telecom grade network functions in at least one DMA system. Exhibit 12 (https://azure.microsoft.com/en-us/products/operator-nexus). Azure Operator Nexus supports a single rack BOM, meaning all of the network functions can be co-located within one housing coupled to the gNB or vRAN at the edge. Exhibit 16 at 2-3 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/azure-operator-nexus-%E2%80%93-the-ultimate-cloud-native-solution-for-mobile-workloads/4066207).

148. The DMA system provides a plurality of network functions including a User-Plane Function (UPF), a Session Management Function (SMF), an Access and Mobility Management Function (AMF), a network exposure function (NEF), a network repository function (NRF), a network slice selection function (NSSF), and AAA functionality based on a policy control function (PCF), a unified data register (UDR) module, an Authentication Server Function (AUSF), and a Unified Data Management (UDM) module. Exhibit 17 (3GPP TS

23.501) at 147-154 (listing and defining the 5G Core Network Functions including AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.).

149. One or more interconnected DMA systems of Azure Operator Nexus further include CU/DU/RAN transceiver equipment providing the functionality of a base transceiver station. Exhibit 18 at 1 (https://marketplace.microsoft.com/en-us/product/inventeccorp1645697962291.5g_e2e?tab=overview). The CU/DU/RAN transceiver equipment is coupled to the housing of the DMA system and operable to receive a call from a mobile subscriber. *Id.*; *see also* Exhibit 19 (https://www.nokia.com/newsroom/nokia-and-stc-use-microsoft-azure-operator-nexus-to-successfully-perform-o-ran-based-5g-private-wireless-network-trial/).

150. In addition to Azure Operator Nexus, Azure Operator Edge also brings Azure services and carrier-grade capabilities to the edge for ultra-low latency scenarios via interconnected DMA systems. Exhibit 8 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/). For example, Azure Operator Edge provides Multi-Access Edge Compute (MEC) in private and public networks and includes subscriber database, policy control, control plane, and user plane network functions. Exhibit 20 at 1-2 (https://www.cloudthat.com/resources/blog/deploy-a-private-mobile-network-using-azure-private-5g-core). Azure Operator Edge includes CU/DU/RAN equipment providing the functionality of a base transceiver station operable to receive a call from a mobile subscriber. Exhibit 18 at 1 (https://marketplace.microsoft.com/en-us/product/inventeccorp1645697962291.5g_e2e?tab=overview). Azure Operator Edge includes AAA functionalities as described above with respect to Azure Operator Nexus. Because Azure Operator Edge deployments are physically located near the cellular towers and

host CU/DU/RAN modules, Azure Operator Edge necessarily interfaces with wireless RF transceivers.

151. An operator's system deployed on Azure Operator Nexus, alone or in combination with Azure Operator Edge, includes functionality to convert a first voice call received at the first BTS interface of a first DMA server into packet data and route the packet data to a destination device via a first DMAG. The call data is de-encapsulated from the IP packets carried over the GTP-U tunnel at the UPF that is the PDU Session Anchor converting them into IP packets carrying voice call data. The NFVI network functions of Azure Operator Nexus, alone or in combination with Azure Operator Edge, receive call data from a mobile device (a first call from a first mobile device) associated with a destination device at the N3 interface (the first BTS interface) of UPF 1 (a first DMA server) running on Azure NVFI.

152. UPF 1 receives and store information and regulates how data is sent from one device through a communications network to a destination device. Exhibit 17 (3GPP TS 23.501) at 148-49. The UPF contains registration data, including data that indicate that the destination device is not within a wireless coverage area associated with the first DMA server. For example, the packet detection rules (PDRs) in the UPF include registration information configured by SMF using the packet detection information (PDIs), forward action rules (FARS), QoS enforcement rules (QERs), and usage reporting rules (URRs). Additionally, the UPF routing table holds IP addresses with mobile devices being serviced by other entities not including UPF 1. This information (registration data), in particular the PDIs, allows UPF 1 to determine that a first DMAG is not within the wireless coverage area associated with UPF 1 (the first DMA server). Using this information (registration data), the first DMA server

determines that the first DMAG supports communication with the destination device located in the IP network.

153. UPF 2 (the first DMAG) is communicatively coupled to a plurality of DMA servers including UPF 1 via the N9 interface and can be communicatively coupled to any number of a plurality of DMA servers via additional N9 interfaces.

154. Upon determining that UPF 2 (the first DMAG) supports communication with the destination device, UPF 1 (the first DMA server) routes the call data to UPF 2 (the first DMAG) via the N9 interface. UPF 2 (the first DMAG) then routes the call data to the destination device located in the IP network, thereby routing the first packet data to the destination device via the first DMAG.

155. Azure Programmable Connectivity (APC), in combination with Azure Operator Nexus, Azure Operator Edge, or Azure MEC, supports telecom signaling, programmable voice services, SIP/session handling, IMS interworking, and communication session(s) orchestrations.



*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 at 7:02 (showing how APC provides developers with one, unified interface allowing developers to program networks for various use cases built on carrier-grade network functions functions).




*See* https://www.youtube.com/watch?v=eC1hVJK4Un4 (showing the various features available to networks deployed using APC, including credential management, resource discovery, resource configuration, simplified billing, resource monitoring, and access to the Azure Marketplace).

156. Azure Operator Nexus provides validated and optimized carrier-grade NFVI (using features like CPU Pinning, SR-IOV, and DPDK) to host telecommunications software like a mobile packet core or session border controllers. Exhibit 26 at 1 (https://azure.microsoft.com/en-us/blog/dpdk-data-plane-development-kit-for-linux-vms-now-generally-available/); Exhibit 27 at 1-2 (https://learn.microsoft.com/en-us/azure/virtual-network/accelerated-networking-overview?tabs=NetworkManager). These network functions process the voice media streams. Azure MEC hosts the user-plane elements of the mobile core

(e.g., UPF) locally. Exhibit 28 (https://azure.microsoft.com/en-us/blog/optimize-your-private-mobile-network-and-accelerate-innovation-with-hyperscale-cloud/). This processes and routes the packetized voice data to reduce latency. APC provides APIs that allow applications to interact directly with the underlying mobile network. Exhibit 10 at 2 (https://blogs.microsoft.com/blog/2024/02/25/accelerating-telco-transformation-in-the-era-of-ai/).

157. APC operates within this carrier-edge environment and provides a unified, standard interface across operators' networks for telecom operators and developers to programmatically access network capabilities. It provides APIs for connectivity, quality of service, and network-aware application development. APC provides for the abstraction of call signaling or session routing via developer APIs to influence connectivity and optimize application performance. According to Microsoft, APC provides programmable interfaces for network-aware applications, enabling scenarios like QoS control, edge resource selection, and integration with operator capabilities. Exhibit 29 (https://thewindowsupdate.com/2024/02/25/azure-programmable-connectivity-empowering-the-next-generation-of-connected-applications/).

158. Voice communications are converted into packetized IP data streams using VoLTE and VoNR technologies operating over IMS, Azure Operator Nexus, and Azure Operator Edge NFVI. These telecom-grade network functions encode and packetize voice information associated with a call into IP packet data streams for transport through the packet core network. Azure APC and Azure MEC provide distributed telecom control and edge communication capabilities consistent with converting voice information associated with a call to packet data. For example, when a call is received, Azure APC provides programmable

telecom signaling, session orchestration, and communications-routing functionality associated with packetized voice sessions, while Azure MEC provides localized edge processing environments in which packetized voice and media traffic are processed and transported with low latency. *See* https://www.youtube.com/watch?v=eC1hVJK4Un4 (showing APC supporting coordinated video-streaming applications across different cities and for different network operators).

159. Microsoft's direct infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

160. Microsoft has had knowledge of Lemko's patents, including the '980 Patent, since at least as early as 2017, if not earlier. Microsoft further learned of its infringement of the '980 Patent from Lemko's filing of the *Microsoft I* complaint, service of '980 Patent infringement contentions for other Microsoft products in *Microsoft I*, and service of the Notice Letter. Microsoft's ongoing infringement in view of this knowledge and notice is willful, blatant, and in egregious disregard for Lemko's patent rights. Microsoft, thus, acted recklessly, willfully, wantonly, and deliberately engaged in acts of infringement of the '980 Patent, justifying an award to Lemko of increased damages.

161. Microsoft's infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

162. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT VI**
**(Indirect Infringement of the ’980 Patent)**

163. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

164. As set forth above, Microsoft has had knowledge of Lemko’s patents, including the ’980 Patent, since at least as early as 2017, if not earlier.

165. As set forth with respect to Count V, Microsoft’s customers directly infringe the ’980 Patent when they use or assemble the Accused Products as an operating network. In addition to directly infringing the ’980 Patent, as discussed above, Microsoft has induced and contributed to its customers’ direct infringement of the ’980 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Azure Operator Nexus as a system infringing at least Claim 1.

166. Microsoft instructs and encourages its customers on how to use the core features of Azure Operator Nexus, including deployment of 5G Core Network Functions, through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, all of which are intended to enable and encourage the infringing use and installation of Azure Operator Nexus to infringe the ’980 Patent.

167. As noted above, for Microsoft Azure Operator Nexus, Microsoft directs its customers to buy a specific BOM (bill of materials) including servers, network switches, dedicated storage arrays, and terminal servers. Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).

168. Microsoft's websites promote Azure Operator Nexus and describe the benefits of Azure Operator Nexus.

169. For example, Microsoft operates a comprehensive online site called Microsoft Learn, with pages including "How-To Guides" and "Quickstarts" covering the configuration, deployment, and use of Azure for Operator Nexus in an infringing manner (as described above). Exhibit 23 (https://learn.microsoft.com/en-us/azure/operator-nexus/). Microsoft Learn covers in-depth installing and configuring of Azure for Operator Nexus, and includes tutorials, articles, and other information regarding Azure for Operator Nexus' mobile edge computing and services features. It also describes the system prerequisites required to run Azure Operator Nexus. Exhibit 24 (https://learn.microsoft.com/en-us/azure/operator-nexus/howto-azure-operator-nexus-prerequisites).

170. Microsoft is liable for contributory infringement of the '980 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that it is contributing to infringement of at least Claim 1 by offering to sell and selling in the United States Azure Operator Nexus. The Azure Operator Nexus software is not a staple article or commodity of commerce suitable for substantial non-infringing use. This is because, as discussed above, when used to operate a system in a mobile network, the software infringes the '980 Patent. It has no function other than to provide these core infringing functionalities. Thus, there is no substantial non-infringing use for Azure Operator Nexus.

171. Microsoft's indirect infringement of the '980 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

172. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney's fees and costs.

**COUNT VII**
**(Direct Infringement of the '478 Patent)**

173. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs, as set forth above.

174. Microsoft has infringed and continues to infringe the '478 Patent, including at least Claim 1, in violation of 35 U.S.C. § 271(a) by, among other things, making, using, importing, selling, and offering for sale in the United States at least the Accused Products without the permission, consent, authorization, or license of Lemko.

175. Microsoft's infringement is based upon literal infringement, infringement under the doctrine of equivalents, or both.

176. To the extent any components of the claimed systems are provided by Microsoft's customers, Microsoft directly infringes by acting as the final assembler of the infringing system. Microsoft acts as the final assembler by configuring the final infringing system at the direction of its customers. Microsoft dictates the precise hardware that its customers must procure to utilize Azure Operator Nexus, which "uses a curated and certified hardware bill of materials (BOM) . . . consist[ing] of commercially available off-the-shelf (COTS) servers, network switches, and storage arrays . . . deployed in an operator's on-premises datacenter." Exhibit 9 at 2 (https://learn.microsoft.com/en-us/azure/operator-nexus/overview). Microsoft also deploys Azure Operator Nexus on top of this hardware as Azure Operator Nexus is "an end-to-end platform from the infrastructure to the tenant for applications" and fully manages and controls the infringing system because "[t]he service that manages the Azure Operator Nexus infrastructure is hosted in Azure." *Id.*

177. Microsoft further directly infringes by directing and controlling the infringing systems, and obtains benefits from its control of the systems as a whole, for example, when Microsoft configures and maintains the infringing systems as a paid service for its customers.

178. Microsoft's customers directly infringe by using and making (to the extent Microsoft is the final assembler of the infringing system) the Accused Products as an operating network. As set forth with respect to Count VIII, Microsoft induces and contributes to its customers' direct infringement.

179. By way of example of Microsoft's infringement of the '478 Patent, Microsoft Azure Operator Nexus meets all of the limitations of Claim 1 of the '478 Patent. Claim 1, for example, recites the following limitations:

> Claim 1. A method comprising:
>
> at a first distributed mobile architecture (DMA) gateway of a DMA gateway communications network:
>
> > transmitting communications information from the first DMA gateway to a second DMA gateway of the DMA gateway communication network, wherein the communications information is associated with a communication network that is accessible to the first DMA gateway,
> >
> > > wherein the communication network and the DMA gateway communication network are different,
> > >
> > > wherein the first DMA gateway is associated with a first group of DMA servers and the second DMA gateway is associated with a second group of DMA servers different from the first group, and
> > >
> > > wherein the communications information identifies each DMA server of the first group of DMA servers;
> >
> > receiving a communication from the second DMA gateway via the DMA gateway communication network,
> >
> > > wherein the communication is associated with a destination device that is indicated by the communications information to be served by the communication network that is accessible to the first DMA gateway; and
> >
> > routing the communication to the destination device.

180. As discussed below, Microsoft's Azure Operator Nexus provides both the software- and hardware-based infrastructure to route a communication to a destination device using DMA gateways hosting and deploying various telecom grade network functions via interconnected DMA servers. Exhibit 12 (https://azure.microsoft.com/en-us/products/operator-nexus).

181. The DMA gateway communication network having DMA servers provides a plurality of network functions including a User-Plane Function (UPF), a Session Management Function (SMF), an Access and Mobility Management Function (AMF), a network exposure function (NEF), a network repository function (NRF), a network slice selection function (NSSF), and AAA functionality based on a policy control function (PCF), a unified data register (UDR) module, an Authentication Server Function (AUSF), and a Unified Data Management (UDM) module. Exhibit 17 (3GPP TS 23.501) at 147-154 (listing and defining the 5G Core Network Functions including AMF, SMF, UDR, PCF, UDM, AUSF, UPF, NEF, NRF, NSSF, LMF, SEPP, N3IWF, etc.).

182. In addition to Azure Operator Nexus, Azure Operator Edge also brings Azure services and carrier-grade capabilities to the edge for ultra-low latency scenarios to route a communication to a destination device using DMA gateways. Exhibit 8 (https://nand-research.com/research-note-microsoft-updates-azure-for-operators/). For example, Azure Operator Edge provides Multi-Access Edge Compute (MEC) in private and public networks and includes subscriber database, policy control, control plane, and user plane network functions. Exhibit 20 at 1-2 (https://www.cloudthat.com/resources/blog/deploy-a-private-mobile-network-using-azure-private-5g-core). Azure Operator Edge includes CU/DU/RAN equipment providing the functionality of a base transceiver station operable to receive a call

from a mobile subscriber. Exhibit 18 at 1 (https://marketplace.microsoft.com/en-us/product/inventeccorp1645697962291.5g_e2e?tab=overview). Azure Operator Edge enables monetization of Microsoft's Azure for Operators Portfolio of products via customer-focused services and customer experience initiatives that include AAA functionalities as described above with respect to Azure Operator Nexus. Because Azure Operator Edge deployments are physically located near the cellular towers and host CU/DU/RAN modules, Azure Operator Edge necessarily interfaces with wireless RF transceivers.

183. Azure Operator Nexus NVFI with interconnected DMA gateways has interfaces to communicate with other networks, including the server clusters at other locations within the operator's network. The servers with these interfaces to other networks are DMA Gateways (DMAGs) and the network connecting these DMAGs is a DMA Gateway communications network. Virtualized functions, such as the user plane function (UPF), receive and store information in a DMA Gateway and regulate how data are sent from one device through a communications network to a destination device. Exhibit 17 (3GPP TS 23.501) at 148-50.

184. When multiple user plane function (UPF) modules acting as DMA Gateways (DMAG) are connected via the N9 interface (DMAG communications network), the data for a destination device is routed from a second DMAG to a first DMAG using the communication information located at the second DMAG. The following diagram generated by Lemko illustrates how two connected user plane function (UPF) nodes are interposed between a local operator IP network and the operator's broader network. Exhibit 17 (3GPP TS 23.501) at 68-69.




Schematic diagram created by Lemko to illustrate interconnection of UPFs in network.

185. An incoming call from the operator's IP Network is received and buffered at the second User Plane Function (UPF 2) (the second DMAG), which signals this to the session management function (SMF). The SMF upon receiving the Downlink Data Report signals to the AMF to trigger a page of the device to reactivate the session. Once the session is re-established the buffered packets are routed to the destination device via the UPF1 (the first DMAG). The Local Network (communication network) is a different network than the N9 interface between UPF 1 and UPF 2 (the DMAG communication network).

186. Each User Plane Function (UPF) (DMAG) interfaces with a different network via its respective N6 interface, such that the first UPF (the first DMAG) is associated with a first data network containing a group of servers servicing destination devices (a first group of DMA servers), and the second UPF (the second DMAG) is associated with a second, different data network containing a group of servers servicing destination devices (a second group of DMA servers). *See* Exhibit 17 (TS 23.501) at 18-23, 106, 149-150.

187. The communications information corresponds to routing and classification information (e.g., forwarding rules) that identify which communications are associated with a communication network accessible to the first UPF. For example, the packet detection rules (PDRs) in the UPF include registration information configured by SMF using the packet

detection information (PDIs), forward action rules (FARs), QoS enforcement rules (QERs), and usage reporting rules (URRs). The UPF contains a routing table that stores IP addresses associated with mobile devices being serviced by other DMA systems, enabling routing of call traffic to the appropriate destination. Exhibit 17 (TS 23.501) at 93-98. The information identifies the servers (each DMA server of the first group of DMA servers) to support delivery of the communication to the destination device. *Id.* at 18-23, 93-106, 149-150.

188. Traffic received at UPF 2 (the second DMAG) is a packet destined for a device in the Local Network recognized based on session information (communications information) stored at the second UPF (the second DMAG). The second UPF (the second DMAG) then forwards to the first UPF (the first DMAG) over the N9 interface (DMAG communications network).

189. With this configuration, communications destined for devices served by the communication network accessible to the first UPF (first DMAG), that is, the local network shown below, are received by the second UPF (second DMAG) and routed to the first UPF. Thus, the packets to be sent (communication) to the destination device are received at the first DMAG from the second DMAG via the DMAG communication network.

190. As described above with respect to Azure Operator Nexus, Azure Operator Edge and Azure MEC environments also include the functional equivalents of DMAGs implemented via virtualized functions such as the UPF.

191. Microsoft's direct infringement of the '478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty.

192. Microsoft has had knowledge of Lemko's patents, including the '478 Patent, since at least as early as 2017, if not earlier. Microsoft further learned of its infringement of

the ’478 Patent from Lemko’s filing of the *Microsoft I* complaint, service of ’478 Patent infringement contentions for other Microsoft products in *Microsoft I*, and service of the Notice Letter. Microsoft’s ongoing infringement in view of this knowledge and notice is willful, blatant, and in egregious disregard for Lemko’s patent rights. Microsoft, thus, acted recklessly, willfully, wantonly, and deliberately engaged in acts of infringement of the ’478 Patent, justifying an award to Lemko of increased damages.

193. Microsoft’s infringement has caused and is continuing to cause irreparable injury to Lemko, and Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by this Court.

194. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

**COUNT VIII**
**(Indirect Infringement of the ’478 Patent)**

195. Lemko repeats, realleges, and incorporates by reference, as if fully set forth herein, the allegations of the preceding paragraphs.

196. As set forth above, Microsoft has had knowledge of Lemko’s patents, including the ’478 Patent, since at least as early as 2017, if not earlier.

197. As set forth with respect to Count VII, Microsoft’s customers directly infringe the ‘478 Patent when they use or assemble the Accused Products as an operating network. In addition to directly infringing the ’478 Patent, as discussed above, Microsoft has induced and contributed to its customers’ direct infringement of the ’478 Patent under 35 U.S.C. § 271(b) by instructing, encouraging, directing, and requiring third parties to make, install, and use the Azure Operator Nexus as a system infringing at least Claim 1.

198. Microsoft instructs and encourages its customers on how to use the core features of Azure Operator Nexus, including deployment of 5G Core Network Functions, through direct communication, trainings, reference materials, user guides, promotional materials, support contracts, sales calls, release notes, webinars, guidelines, videos, manuals, and white papers, all of which are intended to enable and encourage the infringing use and installation of Azure Operator Nexus to infringe the ’478 Patent.

199. As noted above, for Microsoft Azure Operator Nexus, Microsoft directs its customers to buy a specific BOM (bill of materials) including servers, network switches, dedicated storage arrays, and terminal servers. Exhibit 7 at 2 (https://techcommunity.microsoft.com/blog/telecommunications-industry-blog/introducing-azure-operator-nexus/3753393).

200. Microsoft’s websites promote Azure Operator Nexus and describe the benefits of Azure Operator Nexus.

201. For example, Microsoft operates a comprehensive online site called Microsoft Learn, with pages including “How-To Guides” and “Quickstarts” covering the configuration, deployment, and use of Azure for Operator Nexus in an infringing manner (as described above). Exhibit 23 (https://learn.microsoft.com/en-us/azure/operator-nexus/). Microsoft Learn covers in-depth installing and configuring of Azure for Operator Nexus, and includes tutorials, articles, and other information regarding Azure for Operator Nexus’ mobile edge computing and services features. It also describes the system prerequisites required to run Azure Operator Nexus. Exhibit 24 (https://learn.microsoft.com/en-us/azure/operator-nexus/howto-azure-operator-nexus-prerequisites).

202. Microsoft is liable for contributory infringement of the ’478 Patent pursuant to 35 U.S.C. § 271(c) by knowing or being willfully blind to the fact that it is contributing to infringement of at least Claim 1 by offering to sell and selling in the United States Azure Operator Nexus. The Azure Operator Nexus software is not a staple article or commodity of commerce suitable for substantial non-infringing use. This is because, as discussed above, when used to operate a system in a mobile network, the software infringes the ’478 Patent. It has no function other than to provide these core infringing functionalities. Thus, there is no substantial non-infringing use for Azure Operator Nexus.

203. Microsoft’s indirect infringement of the ’478 Patent has injured and continues to injure Lemko in an amount to be proven at trial, but not less than a reasonable royalty. Lemko will continue to suffer damage and irreparable injury unless and until that infringement is enjoined by the Court.

204. Pursuant to 35 U.S.C. §§ 283, 284, and 285, Lemko is entitled to injunctive relief, damages, and attorney’s fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Lemko prays for judgment and relief as follows:

A. An entry of judgment holding that Microsoft has infringed and is infringing the ’111, ’478, ’980, and ’414 Patents; and has induced infringement and is inducing infringement of the ’111, ’478, ’980, and ’414 Patents; and has contributorily infringed and continues to contribute to infringement of the ’111, ’478, ’980, and ’414 Patents;

B. A preliminary and permanent injunction against Microsoft and its officers, employees, agents, servants, attorneys, instrumentalities, and those in privity with them, from

infringing, or inducing or contributing to the infringement of the ’111, ’478, ’980, and ’414 Patents and for all further and proper injunctive relief pursuant to 35 U.S.C. § 283;

C. An award to Lemko of such damages as it shall prove at trial against Microsoft to compensate Lemko for Microsoft’s infringement of the ’111, ’478, ’980, and ’414 Patents that will account for infringement up to trial based on the relevant information and financials produced, where said damages will be no less than a reasonable royalty;

D. A determination that Microsoft’s infringement has been willful, wanton, and deliberate, and that the damages against it be trebled on this basis or for any other basis in accordance with the law;

E. An award to Lemko of enhanced damages under 35 U.S.C. § 284 based on, *inter alia*, Microsoft’s willful infringement;

F. A finding that this case is “exceptional” and an award to Lemko of its costs and reasonable attorneys’ fees, as provided by 35 U.S.C. § 285;

G. An accounting of all infringing sales and revenues, together with post judgment interest and prejudgment interest from the first date of infringement of the ’111, ’478, ’980, and ’414 Patents; and

H. Such further and other relief as the Court may deem proper and just.

Respectfully submitted,

Dated: June 5, 2026

*s/ Jon B. Hyland*
Jon B. Hyland (State Bar No. 24046131)
KANE RUSSELL COLEMAN LOGAN
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4224
jhyland@krcl.com

Paul Andre (*pro hac vice* to be filed)
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Kris Kastens (*pro hac vice* to be filed)
Herbert Smith Freehills Kramer (US) LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
paul.andre@hsfkramer.com
lisa.kobialka@hsfkramer.com
james.hannah@hsfkramer.com
kris.kastens@hsfkramer.com

Aaron Frankel (*pro hac vice* to be filed)
Herbert Smith Freehills Kramer (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7793
aaron.frankel@hsfkramer.com

*Attorneys for Plaintiff*
Lemko Corporation

**DEMAND FOR JURY TRIAL**

Lemko demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: June 5, 2026

*s/ Jon B. Hyland*
Jon B. Hyland (State Bar No. 24046131)
KANE RUSSELL COLEMAN LOGAN
901 Main Street, Suite 5200
Dallas, Texas 75202
Telephone: (214) 777-4224
jhyland@krcl.com

Paul Andre (*pro hac vice* to be filed)
Lisa Kobialka (*pro hac vice* to be filed)
James Hannah (*pro hac vice* to be filed)
Kris Kastens (*pro hac vice* to be filed)
Herbert Smith Freehills Kramer (US) LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
paul.andre@hsfkramer.com
lisa.kobialka@hsfkramer.com
james.hannah@hsfkramer.com
kris.kastens@hsfkramer.com

Aaron Frankel (*pro hac vice* to be filed)
Herbert Smith Freehills Kramer (US) LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-7793
aaron.frankel@hsfkramer.com

*Attorneys for Plaintiff*
Lemko Corporation